at all, oral argument is not to exceed 15 minutes per side. Mr. Combs for the appellants. Good morning. I would say good morning to you guys. I kind of got tripped up on the, you know, the format here, but please go ahead. And you can let us know how much rebuttal you have. Yes, Your Honor. I'm appearing for Kentucky State Troopers Drew Wilson and Aaron Frederick, and I would like to reserve three minutes for rebuttal. Very well. You can go ahead. Your Honor, with the amount, and I'll tell you, this is the first case I've had with a cross appeal. With the amount of briefing in this, I doubt that I can get into much detail about all that we've written. So please feel free to ask any questions that I can clarify, and maybe that'll be more helpful. The basis for the appeal for the troopers is the court's denial of qualified immunity on the entry of the Myers house on May 20, 2018. And the basic facts, they're kind of a brief summary. This started when Trooper Wilson was because the doctors in examining a small child had found some evidence of sexual abuse. They contacted the state police. Trooper Wilson arrived. The child's grandmother was there. His mother showed up. Her name is Erica Letnosky, and she's the main witness other than the troopers in this case. Trooper Wilson talked to Erica. There's a factual dispute about what she told Trooper Wilson. And it seems to me that we have to take the facts in the light most favorable to the other side, which would suggest that we have to assume that she told Wilson, that's not Farley, that's Brad. Would you agree or disagree that we have to take that sentence as I agree with that? So what doesn't that vitiate probable cause to enter the house because they didn't have a probable cause? I don't believe that it does. The question is not whether she said it. The question is what the troopers believed before the troopers ever the hospital. Trooper Wilson, as he said in his deposition, had prior experience with Letnosky when he was with the Lynch Police Department. He said that he had had several incidences of drug use, theft, and child protective services being involved. He knew her from that time. And before they ever left the hospital on the way to Country Estates Road, where the shooting and the entry took place, he told Trooper Frederick that she was probably lying. So he had already said before they ever left that he didn't trust Erica. And that didn't change. When they got to Country Estates Road, and I'm sure we're all familiar with the around the side of the house, threw down his pressure washer. Trooper Frederick jumped out and ran after him. Trooper Wilson was in the car with Ms. Letnosky. And so we have to accept there for summary judgment purposes that she told him, that's not Devin, that's Brad. Trooper Wilson. You do agree that probable cause is an objective standard, right? So technically, subjectively, what they believed is irrelevant. We have to judge probable cause based on the objective facts. I believe that probable cause is based on what the troopers knew, what they believed. Their experience all goes into that, your honor. I don't think that what she said is dispositive of that response that she basically refused to identify the guy. And we have to take that as a fact. If the response is, well, she was lying. I mean, she was the entire basis for believing that he might be at this house. So why would her lack of credibility with respect to that statement also not undermine all of her other statements that he even may even be at this house? And that goes back to the first statement that Trooper Wilson made, that she's probably lying after she told them where he was and agreed to go out there with him. If a jury could find that she did say, you know, that this was not the person they had come to arrest, and more to the point, if the district court said there's a genuine issue as to that, I mean, I don't know how you can overcome that particular determination by the district court. Well, what I'm saying, your honor, is that what matters here is what the troopers believe was true. And they both explained why they didn't believe her. They both said that they continued to believe that this was Devin Farley. I believe the quote from Trooper Frederick was, I thought 100 percent that was Devin Farley. I mean, as Judge Murphy said, I mean, aren't we dealing with objective standards here? I mean, let's just start with that point. It doesn't matter what the officers subjectively thought. If that were true, you know, they could try to get immunity in any case, no matter how unreasonable their actions might be. It's an objective standard, isn't it? Your honor, I believe that the officers in every case where we have to reach a reasonable suspicion or probable cause, evaluate the evidence. And what Ms. Lednoski said is only one factor in the evidence. Counsel, could I interrupt? The district court disagreed with you on what you're arguing now? I believe the district court, I'm not sure. I'm looking on page eight. It sure sounds like what the district court is saying is that the indications were that Mr. Farley might be located. And these facts indicate that the home and so forth on page eight and nine of the opinion seems to me to suggest that on what we're discussing right now, the district court has made a decision. And under Johnson v. Jones, we have to go with that on this interlocutory appeal. Is that correct? Your honor, I believe that we can consider whether the district court correctly based the qualified immunity decision on the facts and the record. Okay. Well, if we disagree with you on that, is that dispositive of this part of the appeal? In other words, if we read the district court to have found that there was at least a genuine issue of fact as to whether the person was correctly identified. If we accept that for purposes of this appeal, is that the end of this, that part of the appeal, and we just have to go on to the cross appeal? I don't think so, your honor. Well, can you assume that and then explain why not? Well, I believe I did assume that I agreed that we have to accept that Erica said, that's not Devin, that's Brad to Trooper Wilson. What if you accept, pardon me, what if you accept that the trooper did not have enough to reasonably believe that this person was the person that he thought it was? Well, in that case, the argument fails as to one trooper. And another point that I believe I made in the third brief is that Erica didn't say anything to Trooper Frederick because Trooper Frederick was already in foot pursuit more or less. He went to the house and stopped, but he was not near Erica. He was not in the car. So what Trooper Frederick got was what Trooper Wilson passed on was, as I recall, the quote, she said, that might not be our guy, but I'm not sure. Something like that, that may not be a perfect quote. You just have a couple of minutes. I'd like to ask you about the cross appeal. Yes, your honor. How do you deal with a part of the, your opponent's brief, which went on for several pages, dealing with the expert testimony about the position of Grant and how he was in a non-threatening position? Can you elaborate your position on that part of your opponent's argument? I can, your honor. And I believe I addressed that in the third brief with a detailed paragraph for each witness that was involved. I don't think that even the plaintiff's expert said that he was in a non-threatening position. And of course, the person who's the best judge of that is Detective Frederick. Detective Frederick, as we said in our brief, he's a state police range officer, what we used to call a firearms instructor. He's also a detective who's investigated homicides. He knows about shooting. He knows about homicides committed, he specifically said, with shotguns. And he's in the room looking at Devin. The only dispute as far as Devin is whether he's at a 45 degree angle or directly facing the trooper. And no matter which way that is resolved, it makes no difference, I believe. It's just as threatening if he was at 45 degree angle as if he was direct. Is that the idea? Exactly, your honor. He's standing in this room with a shotgun a short distance away. Yeah, can I ask you a question? I appreciate the insignia you've got in your video or help me know which lawyers for which side. Sometimes I get confused. Well, how big is the shotgun that we're talking about here? I mean, if he's holding it up to his chin, where are his hands? I guess is what I'm asking. Well, I think I made the point in the third brief that the shotgun was at least short enough that he put it under his chin and could still reach the trigger with his finger because it was undisputed that his finger was on the trigger. That was one of the short shotgun. I don't think it was a short shotgun. I'm sure that part of the reason he was at a 45 degree angle is because he was stretching down to reach that trigger. This was an old single barrel shotgun, typically a pretty long barrel. And somewhere in the brief, we have the length that it's either in Mr. Ward's expert report, or I may have also put it in a note in my. It just doesn't seem under my ignorant view of what a shotgun, how it works. It seems like it would be difficult if you were pointing it under your chin, it would take you at least a few seconds to get it around to be pointed at the police officer. I mean, just by virtue of its length, you're saying it's short enough that it could easily have been twirled around. Your Honor, I'm out of time, but if I can continue to answer the questions. If it's all right with the presiding judge, I wish you would. I don't see it as that difficult. I've been a shooter, a police firearms instructor and that sort of thing all my life. And I think I have the same perspective as Aaron Frederick. I don't see where it's at all difficult to move that shotgun in any direction, moving it to your strong side with your finger down at the trigger might take a little longer, but we're not talking about seconds. We're talking about fractions of seconds. And he wouldn't have had to bring it up to his shoulder to fire. He could have fired it from where he would just have to move. That's what I'm saying. Thank you, counsel. OK, thank you, Mr. Combs. You'll have your rebuttal and we will hear from Mr. Ward. Defendants arrived at the home looking to speak with Devin Farley in connection with the child abuse investigation and allegedly arrest him on a six month old bench warrant. Defendants see a man on the porch who walks inside. Even though they don't know who this person is, they pursue him into the house and chase him into the basement where they find him standing in the middle of the room, turned at an angle with his shoulder pointed towards Mr. Frederick, Detective Frederick, who was standing in the doorway. Within seconds of entering that room, Detective Frederick fired and killed Mr. Grant. There's two issues on appeal. The first issue is the unlawful entry claim and the district court's denial of qualified immunity on that issue. The district court correctly denied qualified immunity for three reasons. First, this court lacks jurisdiction. There's disputed issues of fact, which this court was just addressing with my co-counsel or my opposing counsel in this case. The disputed issues of fact as to whether it was reasonable to believe they were pursuing Mr. Farley, disputed issues of fact of whether a pursuit actually occurred, and there's disputed issues of fact as to whether there was an emergency situation in this case. The second issue on appeal is whether the court appropriately granted summary judgment in finding that Detective Frederick acted objectively reasonable when he used excessive support or when he used deadly force. Two issues of why the court erred in making that finding. First, the district court construed evidence in the light most favorable to Frederick. And then secondly, that when you look at the facts and different versions of events between Mr. Grant's version of events and Detective Frederick's version of events, they're drastically different. And it's for a jury to decide whether the whose version of facts should be accepted. Hey, can I ask, starting with the first question, the hardest part on your side, it seems to me on the entering of the home is whether it just I read the hot pursuit case law, and it's not entirely clear to me what the standard is. And so why wouldn't we jump to clearly established and just say it wasn't clearly established that the hot pursuit exception would not apply here? What's what would be your response to that? Well, the Bernay case, Your Honor, this court held that and that's a Sixth Circuit case from 2017. This court held that an absence of proof that an officer made his intentions known that the plaintiff was under arrest, the plaintiff is free to walk away. There's nothing unconstitutional, illegal about an individual retreating into their own home when they do not want to talk to the police. Police had no reason to or Mr. Grant had no reason to assume that they were there to arrest him. He walked around the corner once he saw the police officers pull in the driveway. They didn't show up with their lights and sirens on to indicate that Mr. Grant was stopped. He was already inside the home by the time that the officers even got out of their vehicles, so they never had a chance to tell him anything. And the United States v. Santana, the Supreme Court found that when those officers showed up, Santana was still out in the public space when the officers exited the van attempting to arrest her and yelling police. At that time is when she fled back into the vestibule and the officers breached in there and arrested her. And the court found the by-pursuit exception applied there because there was an intent known that the individual was going to be arrested, and they made that known by shouting police. While they didn't say you're under arrest, they didn't have time to because she had already fled back into the home. Do you think, just to follow up real quick, the only follow up I had was, do you think they don't have to know for an absolute certainty that this was Farley, right? If they had an objectively reasonable basis to think it was Farley, that would be enough, wouldn't it? That would be enough, Your Honor. But the problem with that is they showed up to this house, they didn't follow their standard practice. Trooper Wilson testified that it's his standard practice when he's going to go pursue someone who they both admit they did not know, they don't know what he looked like, that he would for a physical description, or he would look that person's booking photo up on his computer inside his cruiser. He didn't do that. And they both testified that we didn't do anything to learn his identity because we were relying upon Ms. Letnowski and what she said. She's with us. She can identify him. But yet they don't even rely upon what she says when she tells them it's not him. They just chased after him. Yeah, and Detective Frederick, during the investigation, told one of the, during an interview, he was asked, and this is the record of 28-2, and it's page ID 801-802, and it's, so the search investigator asked him, so you get to the house and you encountered a guy on the porch. Answer, a male subject, yes. Question, all right, I want to clarify it again, that obviously you didn't know who this guy was, right? Didn't know who he was. Whether they knew it was Brad or whether they just didn't know who it was, it wasn't objectively reasonable to chase after that individual into the home when they knew that they didn't have probable cause or a warrant if it's not the subject that they're chasing. Turning to the excessive force claim, when the reasonableness of an officer's action depends on which version of events is accepted, the matters for the jury and qualified immunity should be denied. And that's a Sixth Circuit case from 1989, Brandenburg v. Kirtland. In this case, there's two drastically different events about what happened at the shooting. Under Mr. Grant's version of events, and this is according to Trooper Wilson who was standing behind Detective Frederick at the time of the shooting, he couldn't see into the garage, but could see Detective Frederick's back, he said that Detective Frederick kicked the door open, he yelled, state police, come out. Someone responded, but he couldn't hear what was said. Detective Frederick then leaned around the corner, which is referred to as pying the corner, and he used the door's cover. He leaned his body around and he sees Mr. Grant in the room and he yells, state police, drop the gun, drop the gun, drop the gun. Immediately after the third drop the gun, four shots were fired. Under Detective Frederick's version of events, he kicked the door open, he sees Mr. Grant in the middle of the room by the white bucket, he yells, drop the gun, twice. Mr. Grant responds and says, shoot me. He goes on to say that Mr. Grant's rocking back and forth with his gun up to his chin, he's taking baby steps in a diagonal direction, approaching him, coming towards him. Frederick tells him again to drop the gun, drop the gun, and Mr. Grant responds, shoot me, shoot me. And then by that time he was four or five feet from Detective Frederick and he said that based on his distance, that's why he shot Mr. Grant. But the facts and the way the lower court found was they accepted Frederick's version of events saying that it's not different from the physical evidence, the expert testimony, and the evidence that was put forth by the plaintiff, but that's just not correct. In this case, the specific findings where the court construed the evidence in the light most favorable to the defendant, all related to whether there was additional indicia of an immediate danger. In the Sixth Circuit, possession of a gun, in and of itself, is not justification to use deadly force. There has to be some other indicia of immediate danger. Well, counsel, with respect, there was more, wasn't it? I mean, he's threatening to shoot himself.  You can't say he was just holding a gun. I mean, he was holding a gun and saying, I'm about to use it. You'd think that, is somebody likely to shoot me when he's talking about shooting someone is a lot more than if they're just not talking about shooting anyone. Isn't that true? I would agree with that, but he's threatening to shoot himself and not threatening the officer. It's what the officer perceived, whether he intended to use that weapon on the officer. He can shoot himself in the head if he wanted to, and it wouldn't be unlawful or anything wrong with that. It would be unfortunate. What about the fact that he's got his finger on the trigger? That would certainly seem to be a circumstance that increases the danger. And if we just assume the version of the facts that you favored here, he's got his finger on the trigger, he's holding a shotgun, he's refused to comply with at least two commands to drop the gun, pretty simple command. What is the case that makes clear in our circuit that under those circumstances, the officer clearly establishes that the officer cannot shoot and actually that somebody can hold a shotgun that distance from an officer with their finger on the trigger, and there's not much the officer can do at that point. I think the case law clearly establishes that it's the cases which hold that it is additional indicia of an immediate danger need to be existed. I mean, OK, that's a general standard. And really, and I'm sure you know, in these QI cases, we're looking for an application of a standard to facts that are similar enough to these that the officer should have known that the standard required forbearance under these facts. And under the facts I've described, what is the case that is applying the same standard and factually similar enough that the officer has to realize, OK, he's got his finger on the trigger of a shotgun, he's in close proximity to me, he's disobeyed two commands to drop the gun, but the fact that he has it pointed at his chin means I can't do anything yet. What's the case that makes that clear to a reasonable officer? The best case you have? The best cases would be there's a the Scorsari versus Medzianowski case, and it's a six-year case from 2012. And that relates to whether there was this additional indicia of immediate danger based on movement towards the individual, the officer, that individual had possession of a gun. There's other cases in the Boyd versus Buechler is another Sixth Circuit case from 2012, which finds that moving or raising the weapon or pointing it towards the officer. And that's a similar holding the court found in King versus Taylor. It's another 2012 case from the Sixth Circuit that if the individual is not pointing the gun at the officer or gives any sort of indication that he intends to use the gun. And that's language that comes from Noltenburg, Richland City of Ohio, which is a Sixth Circuit case from February of 2008. So before this shooting occurred, and in that case, the court said that, you know, the suspect has to intend make his intent to use the weapon known or the officer has to perceive that he intended to use the weapon. And that has to be a reasonable perception. And in this case, Mr. Grant's holding the shotgun underneath his chin. His hands are spread apart. It's a nearly four foot long shotgun. He's turned sideways and not facing directly towards the officer. He based on his location in the room, which is by the white bucket, his shoulder would have been turned towards the doorway, which would have made him facing more or less the back corner of the room. And based on the trajectory of the bullets, Detective Frederick was standing in the doorway because the bullets were going slightly downward when they entered Mr. Grant's body. And so. Counsel, you said it's a four foot shotgun. Is that in the record? Yes, it's in our expert report record. And it is in the right. Twenty eight dash 20 is where if he's got it under his chin, where where are his hands more or less? His left hand is wrapped around the very top of the barrel and it's placed directly underneath. Yeah, yeah. His right hand is down by the bottom where the trigger is. And so that's how he's holding that about his waist or is that his chest or is that his knees or where is that? Your Honor, that is unknown, but there was no testimony relating to that. But I believe Mr. Grant. Well, if you know the length of the gun and it's under his chin, I don't know if you can tell me where it is on his body or it would be roughly about his waistline is where it should be, because I think from the barrel in that same expert report, the from the tip of the barrel to the trigger was your your opposing counsel hypothesizes that you could rotate it around, rotate it down such that he could fire straight in a split second. Is that accurate or not? I mean, he's got his hand on the trigger. He's got his other hand on the on the muzzle, I guess. And he could, in theory, have just in a split second, rotated it down and fired in a split second. You can decide to kill someone else rather than yourself. That's what counters against that kind of scenario. That's my question. First is that's his subjective belief for his subjective. Well, yeah, but that's why I'm asking you objectively, what would cause him not to think that? Well, he's he's turned sideways. And so in order to drop the gun down to point it towards him, he's he's turned sideways facing him in this way. Well, 45 degrees, I thought was the sideways 45 degrees or 90 degrees. Well, roughly, I don't know the degree angle. And I know that there's what you gave me was a right turn, not a right half turn. And I know it's kind of hard to do it on video based on. Oh, you're doing a great job. I'm not. You're doing a great job. But I just trying to figure out the answer. If you look at if you look at our briefing, there is a diagram of the burn. And there is a diagram that points specifically where the white bucket is. And the diagram also shows the doorway. And so I would implore this board to look at that diagram and think about how Mr. Grant was standing and how his body would have to be standing in order to have a bullet go through directly through the side of his shoulder. And then another bullet traveled just underneath the skin of his chest, exit his chest and go into his left arm. Because on him holding the gun up like this, the bullet travels across and goes into his left arm. I ask you another question because your time is almost up. And it's just I'm not sure it's relevant to the issues of the case, but it sure goes to the stakes that are involved. If if we were to affirm both the appeal and the cross appeal so that the only thing that goes forward is the is the improper entry with the damages include the the wrongful death or not? Well, it's our position that does. That issue has never been raised in the district court and the United States Supreme Court recently held in Mendez. I think it's Mendez versus the county of Los Angeles that in a similar case where the officers unlawfully entered the home that that they could use that unlawful entry as long as there was a proximate call that unlawful. It's approximate cause determination that would go to the district court in the first place. Absolutely, Your Honor. OK, thank you. We respectfully the plaintiff would respectfully request the court uphold the unlawful entry and then reverse on the excessive force claim. And there is a long side of cases in the fourth brief at the very end dealing with individuals who are possessing weapons and whether they're considered an imminent threat or not. And you can see from reading those cases that whether there has to be the officer has to do something in addition. And that's what the court, you know, inaccurately interpreted the Thornton case to say that that is a similar thing that happened here. But it's not because in that case, the plaintiff had actually threatened people prior to the officer's arrival. And they knew that. Thank you. OK, thank you, Mr. Ward. We appreciate your arguments. We'll hear from Mr. Combs. In response to Mr. Ward, I guess the best answer that every argument he's made is covered in our third brief in a lot more detail than I can talk about in three minutes. He spent some time on this position of Mr. Grant, and I don't think that there's actually evidence in the record to support that. We've got a diagram that was drawn by Lieutenant Little based on what he was told later. This isn't any kind of a certain record. But even Lieutenant Little explained in his in his deposition why that shows Brad Grant being turned somewhat to the side. And I explained in the brief that even Mr. Ward's expert witnesses don't support the claim. For example, he said that Brad Grant was facing the back of the room. And if that's supposed to mean that he was facing away from Detective Frederick, that's just not supported by the record. The eyewitness says it's not true. And the experts don't say that is true. The I think one expert said he was facing the wall, but the description that Detective Frederick gave had him facing a 45 degree angle. So he's facing the wall. That's that's not disputed. He's also facing in between looking directly at the wall and looking at Detective Frederick. As far as his ability to shoot Detective Frederick, there's nothing in the record that says he could not do that. Detective Frederick's belief, based on his experience, was that he could shoot it. And his belief, as long as that's reasonable, is exactly what the standard is for the use of force, whether we're in state court or federal court. Why so many shots? I believe he fired three shots. He's firing a nine millimeter handgun at a guy with a shotgun, your honor. And and it's three shots. The best I recall, it was three shots. I'd have to look through to see if if there was any dispute. But I believe that was correct. Uh, Brad Grant was hit twice, and obviously he was still on his feet when he was hit. So that's as many shots as it took, your honor. And if there are no other questions, we would just ask that the court take a look at this search issue and reverse the district court, because we don't believe that the troopers violated Mr. Grant's Fourth Amendment rights by the entry. And we think it's clear from the record that Detective Frederick was justified in his use of deadly force against Mr. Grant. Thank you. Okay, thank you, Mr. Combs. We appreciate both of your arguments. The case will be submitted and the clerk may adjourn court.